UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

_____
                                        )
BARRY BROOKS,                           )
          Plaintiff                     )
                                        )        Civil Action
V.                                      )
                                        )        No. 05-11861-MLW
WOODS HOLE, MARTHA'S                    )
VINEYARD AND NANTUCKET                  )
STEAMSHIP AUTHORITY,                    )
          Defendant                     )
_____)

_____
                                        )
MARK LALIBERTE,                         )
          Plaintiff                     )
                                        )        Civil Action
V.                                      )
                                        )        No. 05-11224-MLW
WOODS HOLE, MARTHA'S                    )
VINEYARD AND NANTUCKET                  )
STEAMSHIP AUTHORITY,                    )
          Defendant                     )
_____)

PLAINTIFF'S MOTION TO STRIKE CERTAIN EXPERT OPINIONS
OF JOSEPH MOKRY

NOW COME the Plaintiffs, and state as follows:

This case is a negligence case against the Defendant. The case arose out of a man

overboard drill that went very wrong. During the course of the man overboard drill, both

Plaintiffs ended up in the water. Plaintiff Brooks was snagged by the ankle by a rope and was

dragged backwards in the water by a Steamship ferry long enough to medically drown.

The Defendants have retained Joseph Mokry as a liability expert for this case. Mr.

Mokry's qualifications are attached as Exhibit A. Mr. Mokry's conclusions are on page 33 of his

report, and his analysis and commentary is on pages 30-32. Pages 30-33 of the report are

attached as Exhibit B.  The Plaintiff moves to exclude the second sentence of conclusion #6,

having to do with causal relationship, on the grounds that Mr. Mokry is not qualified by

education, training and/or experience to offer this opinion at trial, that it is unreliable under

Daubert and Kumho, and because it is insufficient under Fed.R.Civ.P. 26(a)(2).  Conclusion #6

states as follows: "AB Barry Brooks failed to exercise personal responsibility by ensuring that

his life jacket was full (sic) adjusted and properly secured to his body.  This materially

contributed to his drowning."

I.      LACK OF QUALIFICATIONS

Before a district court may accept an expert opinion, it must first determine that the

expert is qualified.  Correa v. Cruisers, A Division of KCS International, Inc., 298 F.3d 13, 24

(1st Cir. 2002).  The proponent of the expert opinion bears the burden of proving the expert's

qualifications.  Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 970 n.4 (10th Cir.

2001).  Under Fed.R.Evid. 702, witnesses may be qualified as experts if they possess the

requisite "knowledge, skill, experience, training or education."  In order to determine whether a

witness is qualified, the Court "must compare the area in which the witness has superior

knowledge, skill or experience or education with the subject matter of the witness' testimony."

Carroll v. Otis Elevator Corp., 896 F.2nd 210, 212 (7th Cir. 1990).

Per his qualifications, Mr. Mokry claimed expertise in water rescue operations.

However, his academic background is that of an MS in Biology.  While he has published many

articles and papers on search and rescue and in biological research, he claimed no expertise in

physics or hydrodynamics.  Exhibit A.

While Mr. Mokry may be qualified with respect to water rescue operations in general, his

opinion as to causal relationship in conclusion #6 is a specific scientific opinion that does not

flow naturally from expertise in water rescue operations.  This type of opinion is a matter of

physics, and specifically a matter of hydrodynamics.  What Mr. Mokry is saying is that, if Barry

Brooks had fully zipped up his life jacket while he was being dragged backwards through the

water by a big ferry, he would not have drowned.  Only a person qualified in physics and

hydrodynamics is qualified to render such an opinion.

Mr. Mokry has acknowledged that he has not had any education or training in dragging

people by their ankles with life preservers on.  Exhibit C, deposition of Joseph Mokry, p. 162.

Given Mr. Mokry's lack of "knowledge, skill, experience, training or education" in physics,

hydrodynamics, and given that he has not performed any type on this issue, he is not qualified to

offer opinions about whether a fully zipped up life jacket would have made a difference when

someone is dragged backwards behind a ferry.  He is not qualified to offer this opinion, and he

should be barred from doing so at trial.

II.    LACK OF RELIABILITY

A.    The law

Daubert requires that "the proponent of the evidence show that the expert's conclusion

has been arrived at in a scientifically sound and methodologically reliable fashion," Ruiz-Troche

v. Pepsi Cola of P.R. Bottling Co., 161 F.3d 77, 85 (1st Cir. 1998), and that the expert's opinions

for litigation employ "the same level of intellectual rigor that characterizes the practice of an

expert in the relevant field." Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152, 119 S.Ct. 1167,

1176 (1999); Daubert v. Merrell Dow Pharmaceuticals, Inc., 43 F.3d 1311, 1319 (9th Cir. 1995)

("the experts must explain precisely how they went about reaching their conclusions").  The

District Court must determine "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue. <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579, 592-593, 113 S.Ct. 2786, 2796 (1993). <u>Daubert</u> "identified four [non-exclusive] factors that may assist a trial court in determining the admissibility of an expert's testimony," testing [i.e., "whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability"], peer review, rate of error, and "acceptance within the relevant discipline." <u>United States v. Mooney</u>, 315 F.3d 54, 62 (1st Cir. 2002). If an expert's opinions are based solely on experience, he "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702 Advisory Committee Notes.

B. <u>The opinion is not reliable</u>

Mr. Mokry's conclusion is Barry Brooks' failure to zip up his life jacket all the way was causally related to his drowning. As stated earlier, this is a scientific matter, capable of reasonably accurate calculations. A qualified scientist would take the size, weight, and dimensions of the person being towed (i.e., Mr. Brooks), the speed of the tow, the force of the tow (i.e., how big the towing vessel was), the length of time that the person was being dragged,[1] the wave and wind conditions, and the dimensions and properties of the life jacket, if not other

---

[1]      Mr. Mokry was unclear as to exactly how long Mr. Brooks was dragged behind the ferry. He testified that, based on the witness statements, "his sense" or "impression" was that Mr. Brooks was dragged for "probably 15 to 20 seconds." Exhibit C, p. 154. However, he did not take into account the testimony of crew member Steven Bonoli, who testified that the vessel had been under way for approximately 50 to 60 seconds before the captain in the wheelhouse was advised that there were 2 men overboard. Exhibit D, deposition of Steven Bonoli, pp. 28-31.

variables, and do a calculation of whether indeed a fully zipped life jacket of the type that Mr.

Brooks was wearing would have made any difference over a partially zipped life jacket.  Even

then, that does not take into account whether the person was conscious or unconscious,

struggling or limp.  Failure to take these matters into account as well may well skew the final

calculations.

     If any such calculations were done, Rule 26(a)(2) requires an expert to disclose the

calculations that he used to arrive at this opinion, but the report disclosed no calculations.  Mr.

Mokry's deposition was taken, and he acknowledged having performed no tests, experiments, or

calculations to support his opinion.  Exhibit C, pp. 152, 153, 161, 164, 165, 169, 171.  His

"analysis" of this issue in his report is non-existent.  Exhibit B, pp. 32-33.  He did not explain his

opinion in the slightest, writing only that "Brooks himself may have held the final link in the

chain that resulted in his submergence and near drowning."  Exhibit B, p. 33.  At his depositin,

he testified that the basis for his opinion was as follows:

> The life jacket is going to float and you're not going to float.  And the whole
> intent of securing the life jacket as snug to your body as possible is that you
> become a system.  You have a weight and you have a flotation.  And so that for
> the PFD to do its job properly, it has to hold you up as high as possible.  My
> feeling is, to answer the question specifically, that if the PFD had been fully
> secured to Mr. Brooks' body, that he would either not have been pulled under
> water at all or for a much briefer period of time.

Exhibit C, p. 152.  In response to further questioning about exactly what he based on his opinion

on, he acknowledged that it was based on "experience."  Exhibit C, pp. 169, 171-174.  Basing

such an opinion on nothing but experience does not meet the <u>Daubert</u> standard.  Hydrodynamics

is a quantitative field, but Mr. Mokry has analyzed it in a qualitative way, with no testing or

experimentation of any kind.  An opinion that a partially unzipped life jacket is not the type of

opinion that can reasonably and reliably be based on experience.

Accordingly, Mr. Mokry's methodology was not scientifically reliable, and he failed to employ "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Kumho Tire, supra. For these reasons, the second sentence of conclusion #6 should be stricken.

WHEREFORE, the Plaintiffs respectfully request that the second sentence of conclusion #6 of the Report of Joseph Mokry be stricken, and that Mr. Mokry not be allowed to testify about any matters having to do with causal relationship between Mr. Brooks' partially unzipped life jacket and his drowning at trial.

Respectfully submitted
for the Plaintiffs,
By their attorneys,


/s/ David F. Anderson
David F. Anderson
BBO #560994
Carolyn M. Latti
BBO #567394
Latti & Anderson LLP
30-31 Union Wharf
Boston, MA 02109
(617) 523-1000

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

<u>/s/ David F. Anderson</u>
David F. Anderson, Esq.
Latti & Anderson LLP
30-31 Union Wharf
Boston, MA 02109
617-523-1000

Dated: 8/22/07

# RESCUE-RELATED QUALIFICATIONS AND EXPERIENCE
## JOSEPH EDWARD MOKRY

Owner/operator of Ocean Rescue Systems

Education and Certifications
M.Sc. Biology (Master's of Science)- Memorial University of Newfoundland
Instructor- National Association of Underwater Instructors (NAUI) and Technical Diving International (TDI)
Instructor Trainer and Course Director- NAUI and TDI/SDI
Board of Directors/Advisors - Emergency Response Diving International
Emergency Medical Technician- National Registry
First Aid, CPR, AED and $O_2$ Instructor- American Red Cross
Licensed Able-Bodied Seaman (Merchant Marine, Germany)
Captain's license (100 ton)- US Coast Guard
US Coast Guard certified instructor- Fast Rescue Boats and Personal Survival

Practical Experience
Have provided water rescue training to Public Safety personnel from several hundred departments from Puerto Rico to Canada (thousands trained).
Developed programs and delivered boat-rescue and operations training to more than 1200 persons in the past five years.
Developed and delivered surf/heavy weather small boat operations training program for the US Coast Guard Station San Juan, Puerto Rico.
Instruct USCG-approved Fast Rescue Boat operations programs, one of only a handful of such courses approved worldwide.
Developed program and train US Coast Guard Cutter Rescue Swimmers at the request of USCG Groups and Stations, all East Coast locations, (sole provider)
Developed Rescue Swimmer training program for Canadian Coast Guard, Search and Rescue Branch.
Train US Coast Guard Helicopter Rescue Swimmers in swiftwater rescue.
Instructional Staff, Fast Rescue Craft program, Fisheries and Marine Institute of Memorial University, St.John's, Newfoundland. (formerly)
Instructional Staff, Helicopter Ditching at Sea and Evacuation, Fisheries and Marine Institute of Memorial University, St.John's, Newfoundland. (formerly)
Conduct annual Blue Water SAR training for USAF Pararescue units (sole provider)
Maritime Security Boat Tactics - Instructor

Distinctions
Captain, Cape Elizabeth Water Extrication Team (WETeam),Cape Elizabeth Fire Dept, perhaps the most decorated water emergency group in New England.
Received US Coast Guard's Meritorious Public Service award for development of USCG Cutter Rescue Swimmer training program, and for organizing and directing special unit security boat patrols for high value assets, October, 2005. Presented by Admiral Pekoske, Commander, District 1.
Received the US Coast Guard's Public Service Commendation for Lifesaving at Sea for boat-based surf rescue of helicopter pilot ditched at sea, 1995. Presented by Admiral Linnon, US Coast Guard District One Commander.

# RESCUE-RELATED QUALIFICATIONS AND EXPERIENCE
## JOSEPH EDWARD MOKRY

USCG Public Service Commendation 2003 for continuing involvement with ocean rescue operations and program development.

Medal of Bravery (Canada's 2nd highest award) for rescue actions during high surf accident operations. Presented by Governor-General of Canada, 1993.

Outstanding Service Award, for the development of water rescue and safety programs, National Association of Underwater Instructors, 1996.

Numerous other Special Recognition and Public Commendations awards for training programs and involvement in actual rescue operations.

Visiting Professor, Massachusetts Maritime Academy, Buzzards Bay, MA.

Instructor of special operations topics at Maine Maritime Academy, Castine, ME.

Author of many published articles on search and rescue-related topics.

Author of major new text book, <u>Rescue Diving Manual- A Guide to Rescue Techniques, Stress, Injury, and Accident Management</u>. Published by Technical Diving International/Scuba Diving International, 2001.

Author of 30 scientific papers (biological research) published in peer reviewed journals.

Featured on The Learning Channel for cold-water rescue and in-water resuscitation techniques, and boat rescue techniques, 2000.

Clients have included
> US Coast Guard Cutter Rescue Swimmers
> US Coast Guard Helicopter Rescue Swimmers
> US Coast Guard coxswains (BMs 1-3)
> US Air Force Pararescue units around the country
> US Marine Corps Small Boat Combat instructors
> Mid-Atlantic Narcotics Training Agency (marine interdiction training)
> Hundreds of Fire, Police, Sheriff's and Lifeguard services and departments throughout the country.
> Numerous Harbormasters groups and Marine Patrol units
> Logan Airport emergency response crews
> Bath Iron Works emergency response unit (annual)
> Martha's Vineyard, Nantucket, Woods Hole Ferry Service, rescue boat operators, Woods Hole, MA
> National Aeronautics and Atmospheric Administration (NOAA) - National Fisheries Service, Woods Hole, MA
> Woods Hole Oceanographic Institution, Woods Hole, MA

# Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

### Commentary

The review of statements from the various crew and passengers, the US Coast Guard accident report (containing Captain Greg Gifford's internal review), a review of the depositions of AB Brooks and AB Laliberte plus an analysis of the photographs and the narrative itself raise several interesting and significant questions. The US Coast Guard's report contains a maritime violation against the Steamship Authority for lack of an adequate written guide to launching the rescue boat. While this appears true, it is clear from all sources that the rescue boat and deck crew were well versed in this procedure as a result of frequent drills. Given this, it is unlikely that the absence of an adequate guide contributed to this accident.

One of the issues raised by the present review concerns the outboard engine itself. Why didn't it start? With the prospect of the MOB drill looming, crew members had started the engine at least twice prior to the start of the drill. It was reported to be working fine. Its failure to start looms large considering that, if the engine had started promptly, the rescue boat might well have been clear before the M/V Islander made serious sternway.

Small, hand cranked outboards have a reputation for occasionally being difficult to start. Small Johnson outboards are in fact notorious for this. Still it had reportedly started without difficulty only the night before the incident in question. There are at least two possible answers. One is that AB Barry Brooks lacked sufficient experience with this particular engine and made critical errors in the starting procedure. Examples of typical errors are failure to fully seat the 'dead man's switch', attempting to start while in gear, applying too much throttle, crimping the fuel line and so on. The evidence presented, however, does not speak to any of this.

Another possibility is raised by Bos'n William Munson's statement that, anticipating the MOB drill by moments, he checked the rescue boat, connected the fuel line, pumped up pressure in the in-line fuel bulb and then cranked the engine to "put gas in the carburetor". The drill began almost immediately after this, and the rescue boat was lowered to the water. AB Brooks reportedly pulled out the choke and then cranked the engine. This sequence of events could easily have flooded the small outboard and made starting very problematic. Flooding, incidentally, occurs when too much gasoline is introduced into the cylinders with too little air to allow combustion to take place. This is commonplace in small outboards, especially if they're been cranked several times. Under the circumstances pulling out the choke, which limits air supply and provides a richer gas mixture and is otherwise normal procedure, may likely have caused the engine to flood.

Several points around the handling of the sea painters and winch cable also play as factors that affected the chain of events. For example, Mark Laliberte immediately disconnected the bow sea painter after he entered the rescue boat. This is a clear error. The bow painter is last line to be dropped. The reason for this is that the rescue boat can trail back on the painter if the mother vessel still has some way on which is much more

OCEAN RESCUE SYSTEMS

## Report on Capsizing of Rescue Boat
### during Quarterly US Coast Guard Inspection
### 08/04/03

normal than the vessel being stopped completely for the launch. It's easy to imagine the consequences of early dropping of the bow painter if the vessel still has some way on. They would, in fact, have almost exactly the same as what happened in the present case, that is, the rescue boat would have pulled away from the Islander, turned broadside and swamped. BOTH painters must stay attached until the engine is running, but clearing the bow painter first will lead to trouble.

Next, Laliberte clipped the bow painter to the cable. Normal procedure is to cast the bow painter overboard after it is disconnected, so that it can be readily retrieved when the rescue boat returns. Typically the end of the bow painter has a float to make it easier to pick up by the forward crew member. Once retrieved, the rescue boat can hang back on the painter and be directly under the davit arm. It is also an error to clip either painter directly around the cable. Normal procedure is to clip the painter (stern painter) to a link in the hook assembly.

The reason for this requires a little mental exercise. It's clear that the metal clip is capable of sliding up and down the cable as it's not actually fixed in position. Hauling back on the painter to remove the heavy steel hook assembly from too close proximity to the crew (think head injury) has often resulted in the clip merely sliding up the cable and not really moving the hook at all. The hook may still be just above the crew, but now is likely swinging back and forth. I have witnessed this in the past. Even more hazardous, when the hook is being swung down, clipped off on the stern painter; the clip may again easily slip up the cable, resulting in an unexpected drop of the hook. Since hook height is about or just below head height, serious injury may occur.

In any case with the bow painter now clipped off on the cable, Laliberte stands by the hook, ready to release it when the engine starts. There are actually two schools of thought on Laliberte's position. One is that the hook should be released immediately when the boat is set in the water as the boat will ride much better on the painters alone. Also if there is any swell or rough water, the boat's up and down motion brings the heavy hook in dangerous proximity to the boat crew. The other line of thinking is that the hook should be released when the engine starts. At this point the coxswain will release the stern painter and pass it to the crewman who will attach it to the hook. Deck crew will then haul the hook away. Whichever method is policy, however, the crewman will station himself at the hook to control its motion.

What is clear is that Laliberte was unable to release the hook when he finally chose to do so. It is puzzling why he could not do this. In photo DSC_8122 where he is apparently calling for more slack (several statements affirm this) so that he can release the hook (remember this cannot be done under tension) there is clearly slack in the lifting lines (see enlargement). This is not an insignificant matter, since this is the next to last causal step that results in the rescue boat swamping and flooding.

Later statements by Laliberte assert that he was unable to unwrap the release lanyard from around the hook in sufficient time to release the boat from the cable. He also claims that the excess lanyard length was wrap around the hook (a process called

**Report on Capsizing of Rescue Boat
during Quarterly US Coast Guard Inspection
08/04/03**

mousing) because the hook was defective and had a history of opening under load. In fact mousing is a common practice on board ships and other work places as an additional layer of safety. This was a wide spread practice in the Steamship fleet and one that Laliberte would have seen many times before on the Islander and other vessels. The fact is that if the hook is not properly set by closing first the clasp and then the safety (the double click), then it will open under a load. Mousing in this case then prevents an accidental tug on the lanyard that might result in opening an improperly set hook before it is desired.

Still it can be difficult and time consuming to undo an improperly moused hook. The best practice is to take only two turns around the hook mechanism and finish with an incomplete half hitch (a 'slippery' which involves backing a bight rather than the end through the turn), making an easy quick release. Exactly how the lanyard was wrapped in this event is unknown.

The final enabling link in this chain occurs when the stern painter is dropped from the Islander. There is no clear evidence as to how this occurred. We do know that OS Thomas Henrique was tending the stern painter and that at some stage Pilot/Mate Ferguson had him assist at the davit station and then accompany her below decks. Was the aft painter deliberately abandoned to allow the rescue boat to swing away from a stern first attitude, and thus not ship so much water? Was it the irresistible force of the rescue boat loaded with water and dragging heavily away that pulled the line from his hands? Did the force pull the line away despite securing it through a cleat? None of this clear or even mentioned in the crew statements, but its release sealed the fate of the rescue boat.

At this point the rescue boat was fully abeam the apparent water flow and could pendulum on the cable. It would only have taken seconds for the starboard rail to dip and dump the crew. In this case it rolled completely. Note that if the cable had been disconnected earlier, the rescue boat would now have floated free of the M/V Islander, engine running or not.

Brooks and Laliberte are now both in the water. Both are apparently conscious and alert, though no doubt shaken. Brooks' improperly secured PFD will now become an issue as it is barely keeping his face out of the water. He is in fact sinking through it. They are heard conversing and begin to swim away. The final irony of the mismanaged lines is that the stern painter snags Brooks as it trails behind the departing rescue boat. Pulled along by the line and with his unsecured PFD nearly stripped off his body, Brooks is submerged potentially long enough to drown. Only Laliberte's intervention saves his life.

The matter of Brooks' PFD cannot be overstated. About to undertake an activity that maximizes the opportunity to end up in the water, that is, onboard crew during the launching and recovering of the rescue boat, Brooks fails to properly adjust and secure his life jacket. A landsman may be forgiven not donning a life jacket during an at sea exercise, but this is truly surprising in a professional mariner. Even more remarkable is that no one pointed this out to him as he boarded the rescue boat. Even the

**M/V Islander**
## Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

US Coast Guard inspectors must have noticed this, but there is no record of their trying to remind him to zip his jacket. Laliberte was with Brooks every second of the exercise, and, though he securely donned his own jacket, he neglected to check his buddy for the same basic safety procedure.

Ultimately, however, we are all responsible for our own safety. We may remind each other of the safe way of doing things, but it's up to us to act to protect ourselves. Brooks himself may have held the final link in the chain that resulted in his submergence and near drowning.

### Conclusions

1. The unexpected action in backing the M/V Islander down to the overboard Oscar when the rescue boat was in the water and secured to the M/V Islander by the painters put the rescue boat crew in extreme peril.

2. AB Mark Laliberte erred by disconnecting the bow painter before any other actions had been performed.

3. AB Mark Laliberte erred by clipping the bow painter to the cable.

4. AB Mark Laliberte was not able to release the hook from the lifting straps when he tried to do so. The reason for this is not clear (it does NOT appear to be a result of too much tension in the line as he suggested in his statement), but this failure ultimately contributed materially to the capsizing of the boat. A contributing factor in the failure to release the rescue boat was the delay in unwrapping the lanyard from the hook. Time lost here may have been critical in preventing the accident.

5. OS Henrique either cast off or lost control of the stern painter. This materially contributed to the capsizing of the rescue boat by allowing it to be dragged on its beam by the cable.

6. AB Barry Brooks failed to exercise personal responsibility by ensuring that his life jacket was full adjusted and properly secured to his body. This materially contributed to his drowning.

7. AB Mark Laliberte failed in his duty to his shipmate by inspecting and ensuring that AB Barry Brooks' personal protective gear was properly worn.

ORIGINAL

Page 1

Volume: I
Pages: 1-298
Exhibits: 1-26

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MARK LaLiberte,
                    Plaintiff
            vs.                    Docket No.
WOODS HOLE, MARTHA'S VINEYARD      CA 05-11224-MLW
AND NANTUCKET STEAMSHIP
AUTHORITY,
                    Defendant
            *   *   *    *    *    *    *
BARRY BROOKS,
                    Plaintiff
            vs.                    Docket No.
WOODS HOLE, MARTHA'S VINEYARD      CA 05-11224-MLW
AND NANTUCKET STEAMSHIP
AUTHORITY,
                    Defendant

            DEPOSITION of JOSEPH E. MOKRY, a
witness called by and on behalf of the Plaintiffs,
taken pursuant to the Federal Rules of Civil
Procedure, before Heidi B. Stutz, Certified
Shorthand Reporter No. 146599S and Notary Public in
and for the Commonwealth of Massachusetts, at the
offices of Latti & Anderson, LLP, 30-31 Union Wharf,
Boston, Massachusetts, on Tuesday, June 19, 2007,
commencing at 10:13 a.m.

Hennessey & Lange Court Reporting
50 Congress Street
Boston, Massachusetts 02109
617-523-1874 *** 800-645-6807 *** Fax 617-523-7343

1    water in the photographs, it would have been for a

2    much briefer period of time.

3         Q.    Have you ever done any testing in

4    connection with pulling someone by his feet behind a

5    boat both with a life preserver and without?

6         A.    I have not.

7         Q.    What is the basis of that feeling?

8         A.    The basis of that feeling is for the life

9    jacket to -- the life jacket is going to float and

10   you're not going to float.  And the whole intent of

11   securing the life jacket as snug to your body as

12   possible is that you become a system.  You have a

13   weight and you have a flotation.  And so that for

14   the PFD to do its job properly, it has to hold you

15   up as high as possible.  My feeling is, to answer

16   the question specifically, that if the PFD had been

17   fully secured to Mr. Brooks' body, that he would

18   either not have been pulled under water at all or

19   for a much briefer period of time.  We see

20   photographic evidence of the life jacket on the

21   surface but Mr. Brooks under water.

22        Q.    Were you ever shown the photographs of Mr.

23   Brooks being dragged behind or alongside the

24   ISLANDER under water with his life preserver under

Page 153

1    water?

2        A.    I've seen all the photographs that are

3    available.

4        Q.    Meaning, "available" meaning --

5        A.    The ones that we have here in front of us.

6        Q.    Okay.  Have you ever done any testing to

7    see, if you drag a guy with a life preserver

8    alongside a vessel, whether he'll sink or whether

9    he's skim the surface?

10       A.    I have not done that.

11       Q.    Have you ever done any calculations in

12   order to determine whether somebody who is wearing a

13   fully secured life preserver will sink or skim along

14   the surface when he's being dragged backwards?

15       A.    I have never done such a test.

16       Q.    You would agree that his life preserver

17   never came off him completely, that is to say, it

18   was always attached to his body?

19       A.    Yes, I would agree to that, only because

20   I've not seen evidence that suggest that it did come

21   off.  Subsequent photographs show when LaLiberte was

22   alongside with him that it was on his body at that

23   time.

24       Q.    Okay.  And so you would agree that his

```
 1    under water for 15 seconds or whether he was dragged

 2    under water for two minutes.  I'm just going back to

 3    clarify that the 15 seconds came from could a person

 4    actually become unconscious in 15 seconds and, yes,

 5    that's true.  Whether he was dragged under water for

 6    15 seconds or dragged under water for a minute, the

 7    life jacket, if it were working properly, would have

 8    had to -- should have had the same effect, which is

 9    to keep him up at the surface.

10        Q.   Okay.  So your opinion is is that the, if

11    the life jacket was zipped up all the way, that Mr.

12    Brooks would not have been dragged under water, is

13    that correct?

14        A.   Or not dragged under water for such a long

15    period of time.  That's what I think my original

16    statement was.

17        Q.   Okay.  Have you done -- and you've done no

18    testing to determine whether that's true or not

19    true, correct?

20        A.   That is correct.

21        Q.   You've never done any calculations to

22    determine whether that's true or not true, correct?

23        A.   That's correct, I agree with that.

24        Q.   Have you ever had any education or
```

Page 164

1          MR. MUZYKA:  Dave, can we get on

2    with the relevant stuff?  What relevance does this

3    stuff have --

4          MR. ANDERSON:  I'm just trying to

5    figure out what is the basis that if it's zipped,

6    you float on the surface, if it's not zipped, you go

7    six feet under.

8          MR. MUZYKA:  Well, what does a

9    Danforth, the styling of a Danforth anchor or a

10   grappling anchor --

11         MR. ANDERSON:  Because a Danforth

12   creates a hydrodynamic plain.  I don't know whether

13   people do or don't.  Someone's probably figured it

14   out before.  I haven't.

15      Q.   At any rate, you would agree with me when

16   you drag something behind a boat hydrodynamics plays

17   a part, correct?

18      A.   Yes.

19      Q.   What that part is varies from object to

20   object, correct?

21      A.   Yes.

22      Q.   And did you do any testing to determine,

23   with respect to dragging a body behind a boat by the

24   ankle what effect, if any, hydrodynamics had in

1  whether a person went up or went down or went left

2  or right?

3          MR. MUZYKA:  Objection, asked and

4  answered.

5      A.   I've never done such a study, but I've

6  been dragged behind many boats many times.

7      Q.   What capacity?

8      A.   As a diver.

9      Q.   Hand first?

10     A.   Yes, yes, that's correct, holding on to

11 lines, many times.  Sometimes accidentally.  And you

12 will stream up towards the surface.  It's not to say

13 that you surface, but you'd stream up towards the

14 surface.

15     Q.   Okay.  If it's the case that Mr. Brooks'

16 life preserver and his body was completely under

17 water, you would agree that whatever force was

18 dragging him under was overcoming the buoyancy of

19 the vest?

20         MR. MUZYKA:  Objection.

21     A.   I'm a little uncomfortable giving you this

22 answer because a PFD and a body separately do not

23 act the same way a PFD on a body reacts.  It becomes

24 a system at that stage.  The body gains buoyancy

Page 169

1    wouldn't have gone under water and I've not said

2    that.  I'm saying that if he had gone -- he probably

3    would not or may not have gone under water and had

4    he gone under water, which he did, he would not have

5    been submerged as long as he was.

6        Q.    And my question to you is is what is the

7    basis for that other than you just sort of think it

8    would occur?

9               MR. MUZYKA:  Objection.

10       Q.    You haven't done any testing.  Go ahead.

11              MR. MUZYKA:  Objection.  It's been

12   asked and answered.  He's already told you about his

13   experiences, Dave.

14       A.    That was where I was going to go.

15       Q.    Is it based on experience?

16       A.    That's where I was going to go.  And what

17   distinguishes the experience from the circumstance

18   is that, and I freely admit we're holding on to

19   lines by hand, we don't have them wrapped around our

20   fins, but when we're alongside a boat and we have no

21   air in our buoyancy compensator -- I'm trying not to

22   muddy the waters here, but we have no air in the

23   buoyancy compensator.  When the boat starts to move

24   it takes a lot, a lot, a lot of speed before we can

Page 171

1      A.    I'm not certain on 8128 that that isn't

2   his head sticking out of the bottom.

3                MR. MUZYKA:   Okay, 8128, 8129, 8131.

4                MR. ANDERSON:   I see what you're

5   saying.

6                MR. MUZYKA:   They all show him with

7   --

8      A.    Even in 31 enlargement, I mean, it's all

9   but off him.

10     Q.    Let me ask you this.   Okay.   So as I

11  understand the basis of your opinion, it's based

12  upon your experience with being towed behind a dive

13  boat while in scuba diving gear?

14     A.    That's only an example, sir.

15     Q.    Any other thing you based it on?   I'm just

16  trying to nail it down.   You didn't do any

17  calculations, correct?

18     A.    That's correct.

19     Q.    You didn't do any experimentation?

20     A.    Correct.

21                MR. MUZYKA:   Objection, objection.

22     Q.    And you've never observed a guy being

23  dragged behind a boat with a PDF on versus him with

24  a PDF off, correct?   That's not something you have

Page 172

1    first --

2        A.    I've never seen such a side-by-side

3    comparison.

4        Q.    Okay.  So that the -- and you've never

5    learned something in school or training about the

6    difference between being dragged backwards behind a

7    boat with a PDF half on versus PDF fully secured,

8    correct?

9        A.    That's correct.

10       Q.    So it's not education?

11            MR. MUZYKA:   Objection.

12       Q.    It's not training?

13            MR. MUZYKA:   Objection.

14       Q.    It's not calculations, and it's not

15   experimentation, correct?

16       A.    It's not?

17       Q.    It's not any of those four?

18            MR. MUZYKA:   Objection.

19       A.    The last one was?

20       Q.    Calculation.

21       A.    Experimentation did you say?

22       Q.    Yeah, experimentation.

23       A.    Yes, that's correct.

24       Q.    Okay.  So therefore the only thing that's

1  left is experience, correct, in terms of the basis

2  of your opinion, correct?

3       A.   I wasn't sure that you didn't mention that

4  one of the first thing or two.

5       Q.   Well, excuse me, let me be more clear

6  about that.  Experience in other areas, should I

7  say, scuba diving, for example.  Is that correct?

8       A.   I'm sorry, you need to ask me that as a

9  complete question.

10      Q.   We've already gone through what your

11  opinion is not based on.

12      A.   Right.

13      Q.   I won't go into that again.  Now you said

14 yes, it is, because I have some experience in

15 somewhat similar environments and you mentioned

16 being pulled behind a boat while scuba diving,

17 correct?

18      A.   Yes.

19      Q.   Any other similar type experiences which

20 you base your opinion in connection with the Brooks

21 and LaLiberte case?

22      A.   Not directly comparable, no, sir.

23      Q.   Okay.  So the only thing that's directly

24 comparable is being pulled behind a dive boat with

```
 1   scuba diving gear on, correct?

 2        A.   Yes, that's correct.  But that's not the

 3   sole basis for my reasoning.

 4        Q.   What other basis do you have for your

 5   reasoning other than --

 6        A.   My experience with -- I'm sorry, I didn't

 7   mean to interrupt you.  Long experience with dealing

 8   with training people in personal flotation devices

 9   of all kinds, all descriptions.

10        Q.   That tells you you need to, how to put

11   them on, you need to put them on properly.  That's

12   not what I'm asking about now.  I'm asking you

13   about --

14             MR. MUZYKA:  Objection.  I don't

15   think that's what it's limited to.  That's what

16   you're trying to limit it to.

17        Q.   Well, how did training people help you

18   determine what effect of having it half zippered or

19   not zippered at all would have on an individual

20   dragged behind a boat by his leg, how does training,

21   teaching other people how to do this stuff help you

22   determine the effect of it when you're dragged

23   behind a boat?

24        A.   As I said, I have nothing directly
```

Steven R. Bonoli

```
                                                              1
 1                                    VOLUME:  I

 2                                     PAGES:  1 - 61

 3                                   EXHIBITS:  1

 4              UNITED STATES DISTRICT COURT

 5              DISTRICT OF MASSACHUSETTS

 6    - - - - - - - - - - - - - - -x

 7    BARRY BROOKS

 8            Plaintiff

 9                                   CIVIL ACTION

10        Vs.                        NO. 05-11861-MLW

11    WOODS HOLE, MARTHA'S VINEYARD

12    AND NANTUCKET STEAMSHIP AUTHORITY

13            Defendant

14    - - - - - - - - - - - - - - -x

15    MARK LALIBERTE,

16            Plaintiff

17                                   CIVIL ACTION

18        Vs.                        NO. 05-11224-MLW

19    WOODS HOLE, MARTHA'S VINEYARD

20    AND NANTUCKET STEAMSHIP AUTHORITY

21            Defendant

22    - - - - - - - - - - - - - - -x

23             DEPOSITION OF STEVEN R. BONOLI

24
```

Steven R. Bonoli

28

| 1 | A | She never made it into the wheelhouse.  She came to |
| 2 | | the door, the door was open, to give her |
| 3 | | instruction. |
| 4 | Q | What did she say to Captain Dandridge at that point |
| 5 | | in time? |
| 6 | A | "We're in the water." |
| 7 | Q | Are you certain that those are the words she said? |
| 8 | A | I can't be a hundred percent certain because it was |
| 9 | | three years ago, but, you know, I would be pretty |
| 10 | | sure that she said, "We're in the water." |
| 11 | Q | Did you understand what she meant at that point in |
| 12 | | time? |
| 13 | A | Yes. |
| 14 | Q | What did you understand at that point in time that |
| 15 | | she meant? |
| 16 | A | The lifeboat is getting prepared to launch, you |
| 17 | | know.  In my mind we're in the water getting ready |
| 18 | | to release the gripes and get going. |
| 19 | Q | Did you understand when Ellen Ferguson came to the |
| 20 | | wheelhouse and said what she said, did you |
| 21 | | understand there was a problem, there was something |
| 22 | | going wrong? |
| 23 | A | I would say that before I could even rationalize |
| 24 | | that, I would say that before I would give that any |

Steven R. Bonoli

29

1  |  type of analysis because I was focusing sort of on

2  |  looking for the dummy and my course, before I could

3  |  make that assumption or determination, it was made

4  |  for me within the ten seconds or so it took Glen

5  |  Barton to get there and say, "Dave, we've got two

6  |  guys in the water."

7  | Q | And then you understood --

8  | A | Right, when Glen Barton came and there were two guys

9  |  in the water, I understood there was a problem.

10 | Q | In terms of time, it was about 30 or 40 seconds from

11 |  the time period in which Captain Dandridge placed

12 |  the vessel in gear and throttled up until the time

13 |  when Ellen Ferguson came to the pilothouse door and

14 |  said, "We're in the water,"--

15 |  MR. CHIARELLO:  Option.

16 | Q | -- is that correct?

17 | A | No.

18 | Q | What is your best estimate of that time period?

19 | A | The estimate of my time period is based on three to

20 |  four events transpiring in that time period, not

21 |  just Ellen Ferguson coming back and forth.  Within

22 |  my estimate of 35 to 45 seconds, Ellen Ferguson was

23 |  in the door to give instructions and left, upon

24 |  which the lookout exited to go and check to see what

30

| | | |
|---|---|---|
| 1 | | was going on, to Glen Barton passing them coming to |
| 2 | | the door and saying "we're in the water" and then |
| 3 | | Glen leaving.  Those three events transpired within |
| 4 | | the 40, 45 seconds.  It was a split second and fast, |
| 5 | | all of them back and forth. |
| 6 | Q | In the 40 to 45 seconds was the time period from |
| 7 | | when the captain entered the wheelhouse, placed the |
| 8 | | vessel in gear and throttled, up to the time in |
| 9 | | which Glen Barton came to the pilothouse and said |
| 10 | | we've got guys in the water, at which point Captain |
| 11 | | Dandridge took it out of gear, is that correct? |
| 12 | A | I -- |
| 13 | Q | I know it's not exact. |
| 14 | A | The time frame I'm talking about -- Let's just deal |
| 15 | | with 45 seconds, approximately 45 seconds.  The time |
| 16 | | frame I'm talking about I can only do it clearly in |
| 17 | | a sequence, Ellen Ferguson to the door and back, the |
| 18 | | lookout out the door to assist and let the captain |
| 19 | | know what was going on, to Glen Barton reaching the |
| 20 | | door saying "we have two men in the water" and |
| 21 | | leaving. |
| 22 | Q | All those events which you just described -- |
| 23 | A | Yes. |
| 24 | Q | -- took about 45 seconds? |

Steven R. Bonoli

31

1   A   Yes.

2   Q   How long had the vessel been in gear prior to Ellen

3       Ferguson coming to the pilothouse door to say what

4       she said?

5   A   Probably five seconds or so.  It happened fast.

6       Five to ten seconds.

7   Q   Would it be fair to say, then, if she came to the

8       pilothouse door ten seconds after the vessel was put

9       in gear and then there was another 40 to 45 seconds

10      where a variety of events transpired which you

11      testified to, that the vessel was in gear powered

12      toward Vineyard Haven for about 50 or 60 seconds?

13              MR. CHIARELLO:  Objection.

14  A   That's fair.

15  Q   Do you know what the speed of the ISLANDER was at

16      the time it was taken out of gear?  You can say in

17      terms of half speed or a quarter or how many knots

18      or miles an hour, any way you want to describe it.

19  A   I'm not sure at all.

20  Q   What's your best estimate what's the top speed of

21      the ISLANDER?

22  A   I think without any current either way, nine and a

23      half knots, ten.

24  Q   Using that as point of reference, how fast was the